# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 20-1872V**
UNPUBLISHED

|  |  |
|---|---|
| GAVIN ROTH, | Chief Special Master Corcoran |
| Petitioner, | Filed: March 25, 2026 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Renee J. Gentry, The Law Office of Renee J. Gentry, Washington, DC, for Petitioner.*

*Jamica M. Littles, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION DISMISSING CLAIM[1]

On December 16 2020, Gavin Roth filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that a pneumococcal vaccine he received on December 9, 2019, caused him to suffer the Table injury of "Shoulder Injury Related to Vaccine Administration" ("SIRVA"). Petition at 1, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

As explained below, the record preponderates against a finding that Petitioner's injury persisted for at least six months. Therefore, Petitioner cannot meet the statutory

---

[1] Because this unpublished Fact Ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

requirements for compensation – whether the claim arises as a Table SIRVA or a causation-in-fact matter - and his claim must therefore be dismissed.

## I.      Relevant Procedural History

On July 1, 2022, Respondent filed his Rule 4(c) Report opposing entitlement. I subsequently ordered Petitioner to file any additional evidence, statement of completion or a status report regarding Respondent's report. (ECF No. 22). On November 16, 2023, Petitioner filed the instant Motion for Ruling on the Record. (ECF No. 24). On January 9, 2024, Respondent filed his Response brief. (ECF No. 25). Petitioner filed his Reply brief on February 8, 2024. The matter is now ripe for disposition.

## II.      Evidence

### A.      *Medical Records*

Petitioner was 48-year-old physician when he received his third dose of the pneumococcal vaccine on December 9, 2019. Ex. 1 at 10; Ex. 3 at 38; Ex. 6 at 4. The vaccination record does not identify the arm in which Petitioner received the vaccination. *See id*. Prior to this vaccination, Petitioner had no history of left shoulder pain, inflammation, or dysfunction. *See* Ex. 1 at 18-19, 27, 41-43, 48, 57, 62.

On December 17, 2019 (eight days after his vaccination), Petitioner presented at the office of orthopedist Patrick Woods O'Donnell, M.D., with complaints of left shoulder pain. Ex. 2 at 3. Petitioner reported that his pain began after "he had a[n] HPV immunization injection into his left shoulder by an outside clinic." *Id*. He described his pain as "significant[, noting that it] limit[ed] his activities [and was] worse with activity [but] better with rest." *Id*. Petitioner added that "over-the-counter analgesics . . . d[id] not help." *Id*. On exam, Petitioner had full range of motion in his left shoulder with decreased forward flexion and tenderness to palpation of his acromioclavicular joint and "over the leading edge of the rotator cuff." *Id*. Dr. O'Donnell diagnosed Petitioner with "left shoulder joint rotator cuff tendinopathy with impingement" and administered a corticosteroid injection, recommending that Petitioner begin physical therapy ("PT") to treat his left shoulder pain and symptoms. *Id*.

Later that same day, Petitioner had his initial PT consultation at BBN Physical Therapy, reporting that his left shoulder pain began "9 days" earlier, ranged from a 4-8/10, and resulted from his left shoulder vaccination on December 9, 2019. Ex. 3 at 4, 10. Petitioner suspected that his vaccine injection "went in underneath the acromion, possibl[y] into [the] subacromion bursa[,]" ultimately causing "constant" and "throbbing" pain that interrupted his sleep. *Id*. at 10. Emily Kemp, PT, commented that a "muscular driver" was a possible contributing factor to Petitioner's left shoulder pain, "but [it] may also be associated with the effects of gravity on [the] joint space." *Id*.

Two days later (December 19, 2019), Petitioner saw his primary care physician Keith T. Applegate, M.D., reporting that he experienced the "sudden" onset of "persistent" left shoulder pain that had lasted "10 days[,]" making it difficult to reach overhead, push, pull, and lift. Ex. 1 at 7. Petitioner also directed Dr. Applegate's attention to a "high [section of his left] deltoid where [a] band[-]aid reaction [was] faintly present[,]" noting that his left shoulder pain persisted even though he had received a steroid injection and attended his first PT session. *Id*. Upon exam, Petitioner displayed 4/5 muscle strength with signs of tenderness and swelling, and he complained of bursa pain "with passive movement" of his left shoulder. *Id*. at 8. Dr. Applegate diagnosed Petitioner with "arthropathy of the left shoulder" and "subacromial bursitis of the left shoulder joint . . . due to [the] Gardasil immunization." *Id*. at 9. Dr. Applegate started Petitioner on diclofenac sodium 1% transdermal gel and advised him to continue PT. *Id*. at 8-9.

From December 17 - March 9, 2020, Petitioner attended eleven PT sessions and reported gradual improvement in his left shoulder pain and function despite complaints that his left shoulder would occasionally "catch" with movement. Ex. 3 at 4, 10, 14, 16, 18, 20, 22-23, 28, 32. For example, on December 27, 2019, Petitioner reported that he experienced "increased pain while he was [skiing and vacationing in Colorado] and thought it might have been from the cold[;]" but just over two weeks later, on January 16, 2020, he indicated that "his shoulder was feeling better . . . and that the relief lasted for several days." *Id*. at 16, 20.

By Petitioner's sixth PT visit, he had "made some improvement since coming to PT . . . [and] noticed [that] the intensity [of his pain] ha[d] decreased overall" despite some residual "mild pain" with overhead lifting. *Id*. at 22. Likewise, on February 14, 2020, Petitioner reported that his left shoulder "performed well" and his pain was "minimal" except when using his left arm and "placing his luggage in the plane and car" while traveling. *Id*. at 29.

The submitted records reflect that the last date Petitioner attended PT (or sought treatment for his left shoulder in any form) was March 9, 2020. A subsequent PT discharge note, dated May 14, 2020, indicates that he "had to discontinue with treatment during closures for coronavirus. His work schedule (as an MD) also became very demanding and unpredictable, so he has been unable to schedule more visits for PT. He has been absent from treatment for prolonged time . . . ." Ex. 3 at 38. The note further stated that "[h]e made significant progress toward [his] goals during his time in PT, but as of [the] last phone conversation[,] his pain had not resolved." *Id.*

Although Petitioner did not seek any treatment for his left shoulder after March 9, 2020, Petitioner did seek medical treatment later in 2020 for other issues. For example, on July 6, 2020, Petitioner sought treatment for pain following an insect sting. Ex. 1 at 5.

B.    *Affidavit*

Petitioner has submitted a signed (but not notarized) affidavit dated December 15, 2020, in support of his claim. (Ex. 10). In it, Petitioner indicates that prior to the vaccination, he had no issues with pain or range of motion in his left shoulder, but that he felt pain immediately upon receiving the pneumococcal vaccine, and that pain proceeded to get worse over the next 48 hours. Ex. 10 at 1. Petitioner reported that his pain at his first PT appointment was 7/10, and that although he experienced improvement as a result of his PT, he still had less ability to do certain activities of daily living as well as "inability at work to use my left arm in a method that would be utilized appropriately for work requirements." *Id.* at 2.

Petitioner then notes that due to COVID-19, he was unable to continue with his PT and was ultimately discharged in May 2020 despite still having pain, particularly with overhead movements, and limitations in what he could do. *Id.* Finally, Petitioner indicates that one year later, although his pain is considerably less than it was at peak, it still remains and continues to cause issues in his daily life – he describes that it has limited his ability to do outdoor activities and sports with his childing or working around the house, and has been unable to do "certain sports I've done in the past at this time due to the fact that I am unable to move the shoulder in the correct manner that's a requirement for sport or activity." *Id.*

## II.    Applicable Law

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.,* No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25,

4

1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*. The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

**ANALYSIS**

In addition to the Table SIRVA elements, the Vaccine Act includes a "severity requirement," pursuant to which a petitioner must demonstrate that he or she:

(i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

Section 11(c)(1)(D). Respondent's sole objection to entitlement is Petitioner's purported inability to meet severity. There appears to be no dispute that Petitioner received a covered vaccine on December 9, 2019 – therefore, he must demonstrate by preponderant evidence that he suffered symptoms of his injury through at least June 9, 2020.

"[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). In addition, gaps in treatment (when when overlapping the six-month severity deadline) are not an automatic bar to a favorable severity finding. *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where the petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where petitioner did not seek additional treatment after the five-month mark).

In resolving severity disputes, matters frequently turn on the evidence in the case, and how preponderantly it suggests that a claimant's injury and related sequelae likely persisted despite a cessation in treatment prior to the six month "cutoff." For example, in *Cross v. Secretary of Health & Hum. Servs.*, 2023 WL 120783, at *3-4 (Fed. Cl. Spec. Mstr. Jan 6, 2023), a petitioner reported her injury within two weeks of vaccination, and then received treatment consistently for approximately two months, followed by a gap of approximately six months before the petitioner next sought treatment. That gap did not defeat severity. Similarly, in *Zabek v. Sec'y of Health & Human Servs.*, 2022 WL 2584823, at *5 (Fed. Cl. Spec. Mstr. Jul. 20, 2022), a petitioner met the severity requirement when

under five months of treatment were followed by an eight-month gap. Witness statements can also often establish ongoing sequelae. *See,* e.g., *Silvestri*, 2021 WL 4205313, at *1-2 (petitioner was able to supplement the lack of medical records beyond the five-month mark with affidavit testimony indicating that he tried to self-treat his symptoms based on exercises he learned in PT combined with over-the-counter remedies).

The instant case, however, is distinguishable in key respects. Here, there is no evidence Petitioner sought renewed treatment *any time* after cessation of PT in March 2020 – distinguishing this case from matters like *Cross* and *Zabek*. There is also the fact that formal treatment ended three months post-vaccination, and thus not close to the cutoff date (a factor often allowing the inference that a claimant likely was still experiencing sequelae for a little bit longer). Ex. 3 (Petitioner's last PT session and treatment record for his shoulder on March 9, 2019). Thus, the *Silvestri* petitioner ceased treatment for his SIRVA after approximately five months (he received his vaccination on January 9, 2019, and his final treatment record was on June 12, 2019). *Silvestri*, 2021 WL 4205313 at *3. And after only three months of treatment, Petitioner personally attested that he had made "significant progress toward his goals." Ex. 3 at 38. The remaining three months provides enough time for Petitioner's symptoms to essentially resolve, especially given that Petitioner, as an MD and having been through PT and learned the exercises, may have been able to self-treat his lingering symptoms.

Petitioner also has not offered much in the way of personal witness substantiation for the conclusion that his symptoms persisted – unlike other claimants able to meet the severity requirement. He has submitted a single affidavit which only vaguely describes the continued impact of his symptoms after he ceased attending PT. Ex. 10 at 2. In *Silvestri*, by contrast, a petitioner submitted an affidavit from himself as well as from his daughter, his sister, and his wife, all of which provided greater detail on the impact of the injury on the petitioner's daily life, and described a more intensive course of self-treatment to mitigate his symptoms. *Silvestri,* 2021 WL 4205313, at *4.

Admittedly, Petitioner's final submitted medical record is dated May 14, 2020, approximately five months post vaccination, making this case appear in some respects to be one where treatment cessation occurred close to the severity cutoff date. But this record appears to have been unilaterally created by Petitioner's PT provider after Petitioner had failed to book any further PT sessions for the prior two months. Ex. 3 at 38. Specifically, it notes that he "had to discontinue with treatment during closures for coronavirus. His work schedule (as an MD) also became very demanding an unpredictable, so he has been unable to schedule more visits for PT. He has been absent from treatment for prolonged time and will be encouraged to seek a new Rx from MD for return to treatment as it is appropriate and he is able to return. He made significant progress toward goals during his time in PT, but as of last phone conversation his pain had not resolved." *Id.* It is unclear from the record when this last phone conversation occurred.

The Program does often treat severity disputes liberally, allowing compensation for otherwise exceedingly mild SIRVAs that facially merited little intensive treatment (and hence will feature modest damages awards). But not all vaccine injury claims can satisfy the requirement – and they do not do so just because some claim elements (as here) have been met. The combination of evidence in this case does not preponderate in favor or a finding of severity.

### Conclusion

In view of the evidence of record, I find that Petitioner is not entitled to compensation for a SIRVA injury because he has failed to establish by preponderant evidence that his symptoms persisted for at least six months. Therefore, no version of the claim can succeed, and Petitioner's claim is dismissed.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[3]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[3] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.